No. 25,789.

GEORGE S. BADDERS, doing business as THE BADDERS MOTOR COM-
PANY, *Appellant,* v. THE CHECKER CAB AND BAGGAGE COMPANY,
*Appellee.*

SYLLABUS BY THE COURT.

BILLS AND NOTES—*Delegatio Novation—Intention to Innovate—Evidence.* A
note was given by a corporation in part payment for some busses. The
corporation transferred the possession and title of the busses to one of its
members under an agreement that he should pay the balance owing on the
note, which the payee had indorsed with recourse. The new owner of the
busses executed to the same payee a note for such balance, which was in-
dorsed as before, the indorsee returning the original note, with the word
"Rewritten" across its face, to the payee. Later the indorser paid the in-
dorsee the amount of the second note and received possession of it. He
then sued upon the first note. In that action it is held that whether the
transaction amounted to a novation, and upon the acceptance of the second
note the maker of the first note was released from liability, depends upon
the intention of the parties; and that the evidence was sufficient to support
a finding that all of them intended that effect.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB,
judge. Opinion filed March 7, 1925. Affirmed.

*John M. Williams,* and *Arthur F. Davis,* both of Topeka, for the appellant.
*Silas Porter,* of Topeka, for the appellee.

The opinion of the court was delivered by

MASON, J.: On June 20, 1922, the Checker Cab and Baggage
Company bought of George S. Badders five Ford busses, in part
payment for which it gave two promissory notes, one for $1,051,
which has been paid and is not in controversy, and the other for
$3,806.64, payable in monthly installments of $257.22. Badders
sold the larger note to the Motors Finance Company, indorsing it
with recourse. O. M. Estes, a member of the Checker company, ar-
ranged with the other members that he should surrender his stock
and take the busses as his share of the concern, with the purpose of
setting up a new business under the trade name of the Diamond Cab
and Baggage Company, which was to assume the payment of the
part of the note for $3,806.64, which was still owing. In pursuance
of this arrangement, Estes on October 9, 1922, took the busses and
in the name of the Diamond company, executed to Badders a note
for the balance, amounting to $2,315, payable in monthly install-

ments maturing at the same time as in the original note. He also signed a bill of sale, purporting to transfer the busses to himself, in which he assumed all responsibility for them and released the Checker company therefrom. Badders indorsed this new note to the Motors Finance Company, with recourse. The Motors Finance Company wrote in a large hand across the face of the old note the word "Rewritten," with a heavy line thereunder, and returned it to Badders. The new note not being paid at maturity, Badders paid the balance to the Motors Finance Company, which turned it over to him. Badders then brought this action against the Checker company upon the two notes signed by it. The note for $1,051, as already indicated, was placed in judgment and paid off, and does not affect the present controversy. Upon the cause of action based on the note for $3,806.64, judgment was rendered in favor of the defendant on the theory of novation—on the ground that the new note signed by the Diamond company had been accepted in satisfaction and discharge of the one signed by the Checker company. The plaintiff appeals.

To justify a holding that the note signed by the Diamond company was accepted under such circumstances that the Checker company was thereby discharged from liability, it is necessary that the evidence should support a finding that such was the intention of all the parties to the transaction. (20 R. C. L. 366, 371.) It is not necessary, however, that there should have been an express agreement to that effect; an intention to release the original debtor may be established by implication—from circumstantial evidence. (*Insurance Co. v. Benner*, 78 Kan. 511, 97 Pac. 438; 20 R. C. L. 372; 29 Cyc. 1132.) There was evidence that Estes (the Diamond company), the Checker company and the Motors Finance Company understood that the acceptance of the note of the Diamond company was to result and did result in the release of the Checker company; but the plaintiff contends that there was no evidence whatever that he understood, intended or agreed that such consequences should follow. He also makes the same contention as to the Checker company, but one of its representatives, while testifying about the deal for giving Estes the busses, was asked: "Who was to pay these notes?" He answered: "Well, up until Mr. Badders accepted somebody else as security we felt we was liable." It may fairly be inferred from this that the Checker company regarded the arrangement as a novation—as one which when put into effect would re-

lease the Checker company from liability. Another member of the Checker company testified that after Estes took the busses the company didn't know it had anything more to do with them.

The Motors Finance Company, as the owner of the Checker company note, could of course have made any arrangement it saw fit as between itself and the Checker company and the Diamond company, if it was willing to relieve the plaintiff from his liability as indorser. It obviously was unwilling to do this, for it required the plaintiff to indorse the new note as he had the old. The plaintiff by indorsing the new note indicated an acquiescence in its being taken, and the question to be determined is whether there was any evidence that he understood that the arrangement of which the acceptance of the new note was a part contemplated the release of the Checker company, or had actual or constructive knowledge that such was the understanding of the other parties. The decision of that question requires a somewhat extensive review of the evidence bearing upon the plaintiff's knowledge of and relation to the transaction.

The plaintiff while on the stand was asked what his purpose was in taking the Diamond company's note. He answered: "These folks [Estes and the other members of the Checker company] wanted to divide their business, . . . one of them taking a part of the operating part of the business, the bus end, and the other the cabs and trucks; some arrangement they had among themselves; I don't know what it was; I don't know what their arrangement was among themselves; the only thing I was asked in reference to this note was if we would indorse this note." Asked if his purpose in indorsing it was to pay off and cancel the old note he said: "No, sir; it was simply to accommodate the boys in arranging their business in this way. . . . I don't know what their arrangements were; this note wasn't released in the making of this note, and the Motors Finance Company were distinctly instructed not to release this note [the Checker company note] or the mortgage, and they didn't release it."

The Motors Finance Company, when the plaintiff paid the balance due to it, gave him a receipt expressed to be in settlement of the busses referred to and a full release of its interest in the Diamond company note. The plaintiff while on the stand was asked why both notes were not included in the paper, and answered that the original note had already been returned to him.

Estes testified that the plaintiff's representative, G. W. Christner, called him on the telephone, saying the boys of the Checker cab company were very anxious to get some notes transferred—"that there be other notes made," and asked him to come down and sign "these notes" (the witness obviously meaning the new note, which he for the moment thought of as a series of notes, because of its being payable in installments) ; that a representative of the Motors Finance Company said something to him about it and he went to the plaintiff's office and signed the Diamond company note, which was made out by Christner. In the course of the cross-examination it was suggested to him that the new note was not given in payment of any other indebtedness that was owing by the Checker people to the Motors Finance Company or to the plaintiff; to which he responded, "I don't know what else it would be." He also said he understood that he was giving the note to cover the assumption he had made in the paper he had signed, purporting to be a bill of sale.

One representative of the Motors Finance Company testified, in effect, that he had understood the giving of the new note, which he drew up, released the old one; that his recollection of his conversation on the subject was that he merely called for assurance that it was all right to make this transfer, and that they [the plaintiff] would indorse the new paper with recourse. Another testified that Estes stopped him on the street and said he was going to take the busses and would like to have the loan rewritten, releasing him from liability for what was due on the other property of the Checker cab company, and placing the liability on him for the debt against the busses; that the loan was rewritten; that the plaintiff "was consulted with reference to it"—the context seemingly indicating the witness was speaking of the rewriting of the loan. The following is an extract from his examination, all the questions but the first and last being asked by the judge:

"Q. And did you have occasion from time to time to know or hear whether he [Estes] was in possession of them [the busses]? A. Yes, he was in possession.

"Q. Well, at the time the note was rewritten was that talked over with Mr. Badders, or do you know about that? A. Yes, sir.

"Q. Did he ever make any objection to that when you came to turn the new note back; did he object to it in any way? According to your statement, he had taken another note in place of this? A. Yes, sir.

"Q. And you gave this note back to him then? A. Yes, sir.

Badders v. Checker Cab Co.

"Q. And afterwards you turned back the new note? A. Yes, sir.

"Q. Did he ever make any objection to this being handled that way? A. No, sir.

"Q. Do you know whether he knew about it? A. Well, he signed the name on the back, I think."

A chattel mortgage on the busses was given by the Checker company to secure the note signed by it, and another by Estes as the Diamond company to secure the new note, neither of which was released. Estes carried on the business for some time, but finally abandoned it and turned the busses over to the plaintiff, who still held them when this action was brought. The Checker company when it gave the note in controversy had not been incorporated, but steps to that end were in progress and a charter was granted shortly afterwards, so that the situation is the same as though it had been a corporation from the first. This portion of the direct examination of Christner is cited by the defendant as showing that no demand was ever made for the payment of the note sued on:

"Q. Now, then, what was done about this note—the one that you have there [that sued upon]? . A. Well, few days later, as I remember it, we got this note from Mr. Copeland.

"Q. Then what did you do with it? A. We filed it away with our other notes.

"Q. Did you make a demand upon the Checker Cab and Baggage Company for the payment of it?

"Defendant's attorney: Object to it; he may have made a demand for it.

"The Judge: If you did anything about it, what was said? A. No, I don't.

"Plaintiff's attorney: Well, who did? A. I don't know that anyone did.

"Q. Well, did you ever take this note to them for payment? A. I never took any note to them for payment."

The circumstance that the old note was delivered to and kept by the plaintiff after the execution of the new one, instead of being returned to the maker, has some tendency against the theory of a discharge by payment or novation, but is not conclusive. The fact that the old note, although retained by the payee, bore the word "Rewritten" across its face in such a manner as to suggest a cancellation militates against the ordinary inference from its retention. The arrangement between the Checker company and Estes by which he was to take the busses and pay the balance owing upon them, giving his own note for the indebtedness, was one readily lending itself to interpretation as designed to discharge the Checker company from liability; for if that were not the intention there would seem little

or no purpose in the giving of the new note, because if the object were merely to effect an adjustment on the part of the Checker company and Estes by which he assumed an obligation to it to pay off the lien on the busses, that result could have been accomplished just as well by an agreement between the two parties in interest without the execution of a new note and without the coöperation of the plaintiff or the Motors Finance Company. As suggested by the trial court in a memorandum opinion, the situation is somewhat analogous to that presented where a new firm agrees to assume the liabilities of the old, in which case "but slight circumstances are required to justify finding an *intention* on the part of a creditor of the old firm, who has notice of the dissolution and agreement, to accept the liability of the new instead of the old firm." (*Tysen & Co. v. Somerville*, 35 Fla. 219, 227.) The plaintiff knew something of the plan of the Checker company and Estes. The testimony that he was consulted about it has some force, notwithstanding the witness did not tell what was said. The circumstance that the plaintiff's representative asked Estes to come to his office and sign the new note, telling him that the Checker people were anxious to have the readjustment made, suggests a knowledge of the advantage it was intended the Checker company should derive from it. In the judgment of this court, the evidence, aided by the most favorable inferences that can reasonably be drawn from it, supports a finding that the plaintiff either understood that the new note was to be taken in discharge of the old, and consented to that arrangement, or had knowledge of such facts as to charge him with notice that the other parties so regarded the transaction, and by his participation without objection acquiesced in that view of it. That other testimony was given having a contrary tendency is of course not material, for the decision of the jury and trial court must stand if supported by any substantial evidence.

Complaint is made of the ruling of the trial court allowing the Checker company to amend its answer to conform to the evidence. No showing was made that the plaintiff was misled or denied a full opportunity to meet the new matter presented. The case differs in this respect from the one largely relied upon by the plaintiff, where upon the allowance of an amendment to the pleadings the adverse party stated he was not prepared at once to meet the new issue, but could disprove the new allegations if given time, for which purpose he asked a postponement. (*Roniger v. McIntosh*, 91 Kan. 368, 137

Pac. 792.) In the present situation the allowance of the amendment is not a ground of reversal. (R. S. 60-753, 60-759.)

Complaint is also made of the overruling of motions to appoint a receiver and to revive the action in the name of a new defendant. Inasmuch as a judgment against the plaintiff on the merits is to be affirmed, these rulings are no longer material. The refusal of the court to make additional findings is also urged as error. In our view the question already discussed is the vital one in the case, and its decision in favor of the defendant renders further findings unnecessary.

The judgment is affirmed.

HARVEY and HOPKINS, JJ., dissenting.